UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
9/23/2024
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA           )
                                   )
v.                                 )     Case No. 2:22-cr-00067
                                   )
DEVEN MOFFITT                      )

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL**
(Doc. 137)

Pending before the court is Defendant Deven Moffitt's motion for a judgment of

acquittal or for a new trial. (Doc. 137.) Mr. Moffitt was charged in the Indictment with

Count I: knowingly and intentionally possessing with intent to distribute fentanyl and

cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); Count II: knowingly

possessing firearms, specifically a .22 caliber High Standard Mfg. Corp. revolver and a

9mm Hi-Point pistol, in furtherance of the drug trafficking crime alleged in Count I, in

violation of 18 U.S.C. § 924(c)(1)(A); and Count III: knowingly possessing firearms,

having previously been convicted of a crime punishable by imprisonment for a term

exceeding one year and knowing he had been convicted of such a crime, in violation of

18 U.S.C. §§ 922(g)(1) and 924(a)(2). A trial was held from May 13, 2024, to May 16,

2024. On May 16, 2024, a jury convicted Mr. Moffitt of all three Counts. Mr. Moffitt

moved for a directed verdict of acquittal at the close of the government's case-in-chief

and renewed that motion at the close of all evidence. Both motions were denied.

Pursuant to Fed. R. Crim. P. 29(c), Mr. Moffitt seeks a judgment of acquittal

notwithstanding the verdict, arguing that the government's evidence at trial was

insufficient to support his convictions. In the alternative, he moves for a new trial under

Fed. R. Crim. P. 33(a) on the same basis. The government opposes the motions.

The government is represented by Assistant United States Attorneys Andrew C.

Gilman and Michael P. Drescher. Mr. Moffitt is represented by Kevin M. Henry, Esq.

## I.     The Government's Evidence at Trial.

The government presented evidence that on the morning of June 1, 2022, Vermont State Police ("VSP") officers were tasked with executing an arrest warrant issued for Mr. Moffit in an unrelated state case. Earlier that morning, Mr. Moffitt had left his father Bernie Moffitt's apartment to conduct a drug transaction and search for a lost electronic benefits transfer ("EBT") card. At the time, Bernie Moffitt resided at the Brookside Apartments complex in Bennington, Vermont. Officers conducting surveillance prior to the arrest determined that Mr. Moffitt was traveling in a silver Jeep driven by KC Myers. According to body camera footage, the officers identified Mr. Moffitt standing in front of the Brookside Apartments, and when they commanded him to put his hands up, Mr. Moffit fled down an alleyway. As he was fleeing, the VSP officers shot at him with fluorescent green paintball rounds.

After a few minutes of pursuit, the VSP officers located and arrested Mr. Moffit in front of a house on Jefferson Avenue, a residential street near the Brookside Apartments. Mr. Moffitt's pants were marked with fluorescent green paint, and he was wearing a black fanny pack. The VSP officers conducted a search of Mr. Moffitt's person incident to arrest and removed the fanny pack. One of the officers opened the pack and saw that it contained a large amount of U.S. currency.

Following Mr. Moffitt's arrest, a VSP officer spoke to a neighbor, Douglas Goble, who stated that he saw Mr. Moffitt discard an object in a trash can located directly across the street from Mr. Goble's residence. After Mr. Goble identified the location, a VSP officer examined the trash cans and retrieved from a recycling bin a black sling bag marked with fluorescent green paint.

Shortly after Mr. Moffitt's arrest, law enforcement officers arrested Harley Reynolds, Mr. Moffitt's girlfriend at the time, outside the Brookside Apartments pursuant to an outstanding federal arrest warrant. In the month prior to Mr. Moffitt's arrest, the evidence showed Ms. Reynolds and Mr. Moffitt were jointly selling cocaine, cocaine base, fentanyl, and heroin. At the time, both Mr. Moffitt and Ms. Reynolds were each

2

consuming up to 200 bags of heroin a day. Ms. Reynolds was also consuming up to seven grams of cocaine base a day.

Ms. Reynolds testified to witnessing part of the police chase. Because of Mr. Moffitt's arrest, she believed law enforcement was likely to search Bernie Moffitt's apartment, and she began to search the apartment for items law enforcement might want to seize, including three safes which she found open and empty. Mr. Moffitt was the sole person with access to one of the safes.

On the day of Mr. Moffitt's arrest, law enforcement officers were contacted by Russell Silva, a resident of the Brookside Apartments, who observed Mr. Moffitt on the ground looking for something and then fleeing from the VSP officers. Mr. Silva located two cell phones from the area where Mr. Moffitt was seen. Law enforcement officers met with Mr. Silva that day and obtained the two phones. One of the phones, an iPhone, was powered on and unlocked, allowing law enforcement officers to see Facebook Messenger conversations on the screen. Law enforcement officers subsequently obtained a search warrant for the iPhone. The second phone was not charged and was never powered on or searched.

A search of the iPhone revealed photos of Mr. Moffitt, photos of a large amount of U.S. currency, as well as text messages referring to the user of the phone as Mr. Moffitt. Some of these messages were from Mr. Moffitt's father, Bernie Moffitt. Officers additionally found Facebook Messenger messages between Mr. Moffit and Ms. Reynolds regarding coordinated drug sales. Although Ms. Reynolds testified to having her own drug business as well as working with Mr. Moffitt, the messages established that Mr. Moffitt would often instruct Ms. Reynolds on whom to sell to, what quantity to sell, and the amount she should charge. Mr. Moffitt and Ms. Reynolds each had their own phone, and Ms. Reynolds testified she used Mr. Moffitt's on the day of his arrest. The iPhone further revealed text messages from drug customers to which Mr. Moffitt responded.

On the day of Mr. Moffitt's arrest, law enforcement obtained and executed a search warrant for the black sling bag and fanny pack. They found approximately $16,400 in U.S. currency and Mr. Moffitt's debit card in the fanny pack. In the black

3

sling bag, they found over 3,500 bags of suspected heroin and fentanyl primarily in fifty half-pack bundles partially wrapped in tinfoil, approximately twenty grams of suspected powder cocaine, approximately thirty-eight individually wrapped pieces of suspected cocaine base, and a small digital scale with white residue consistent with cocaine base. The bags of suspected heroin and fentanyl had various stamps on them: "Game of Death," "Empire," "Wawawa," or "Tom and Jerry." Some of these stamps were mentioned in the iPhone's text messages. A chemical forensic analysis confirmed the items seized were controlled substances. A forensic chemist testified to the weight and nature of the controlled substances seized. Seven prints were recovered from the tinfoil wrapping in which some of the drugs were found. Further analysis indicated all seven prints belonged to Mr. Moffitt.

While searching the black sling bag, law enforcement officers recovered a .22 caliber High Standard Mfg. Corp. revolver. The revolver's cylinder was marked with green-colored marking paint which appeared to have come through a hole in the sling bag which was also marked with green paint. At the time of the search, the firearm was loaded with nine ammunition cartridges. Officers additionally found a Hi-Point semiautomatic 9-millimeter handgun which was loaded with one bullet in the chamber and the safety was off. Officers swabbed both firearms during the search, but those swabs were not sent for processing. A fingerprint expert explained the difficulties of obtaining fingerprints from firearms, testifying the recovery rate was "[o]nly about 10 to 15 percent of the time." (Doc. 133 at 217.) The contemporaneous search of Mr. Moffitt's iPhone revealed text messages referencing his possession of these firearms as well as his desire to acquire firearms.

## II.    Conclusions of Law and Analysis.

### A.    Whether the Evidence at Trial Was Sufficient to Sustain the Jury's Verdict.

Mr. Moffitt argues that the government's evidence at trial was insufficient for the jury to convict him of any of the Counts in the Indictment and that he is therefore entitled to a directed verdict of acquittal. "If the jury has returned a guilty verdict, the court may

4

set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29. "A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'" *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (quoting *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994)). The test for sufficiency of the evidence is "whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008), *cert. denied* 555 U.S. 1148 (2009) (internal quotation marks omitted). It is permissible for the jury to have "base[d] its verdict entirely on inferences from circumstantial evidence, and the evidence need not have excluded every possible hypothesis of innocence." *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) (citation and internal quotation marks omitted).

The court may not grant a motion for acquittal if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). Under this demanding standard, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

In considering the sufficiency of the evidence presented at trial, "the court must be careful to avoid usurping the role of the jury. . . . Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal citations and quotation marks omitted) (second alteration in original). The court must "resolve all inferences from the evidence and issues of credibility in favor of the verdict." *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000), *cert. denied sub nom. Henderson v. United States*, 531 U.S. 909 (2000).

5

## 1.    Count I: Possession with Intent to Distribute Fentanyl and Cocaine.

Mr. Moffitt argues that, although the government presented evidence that he had previously engaged in drug distribution, the evidence was insufficient to establish beyond a reasonable doubt that on the morning of June 1, 2022, he possessed controlled substances with the intent to distribute them. He argues it was equally likely that the drugs found on his person were for his personal consumption, or for distribution by Ms. Reynolds.

For Count I, the government was required to prove the following beyond a reasonable doubt: (1) that on or about June 1, 2022, Mr. Moffitt possessed one or more of the controlled substances charged in the indictment; (2) that Mr. Moffitt knowingly and intentionally possessed the controlled substances; and (3) that Mr. Moffitt possessed one or more controlled substances with the intent to distribute them.

The government presented evidence through a number of witnesses and sources to establish that at the time of his arrest, Mr. Moffitt was actively engaged in drug trafficking. For example, Ms. Reynolds testified that she and Mr. Moffitt worked together to sell heroin, fentanyl, cocaine base, and cocaine powder during the time period alleged in Count I, including on the day Mr. Moffitt was arrested. She further testified that on June 1, 2022, Mr. Moffitt left his father's apartment to conduct a drug transaction. Facebook messages between Ms. Reynolds and Mr. Moffitt corroborated Ms. Reynolds's testimony by documenting instances in which Ms. Reynolds sought and received Mr. Moffitt's permission to conduct certain drug transactions and directions for doing so. Although Ms. Reynolds testified to also having her own drug trafficking business, there was no evidence that Mr. Moffitt was merely holding drugs for her benefit, and any such claim was belied by text messages revealing Mr. Moffitt's response to drug customers' demands and inquiries.[1] Additionally, the bag in which the drugs were found had two

---

[1] These text messages are admissible even if the other participants' identities to the communications are unknown. *See United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (finding messages were not hearsay because they were offered "to provide context for defendants' messages sent in response to them, messages whose admissibility is not contested").

6

holes at least one of which was marked with green paint as was a firearm inside the bag, supporting a reasonable inference that the defendant was wearing or carrying the sling bag when he was shot by law enforcement with paintballs as he fled. *See United States v. Triumph*, 266 F. App'x 53, 55 (2d Cir. 2008) ("Flight evidence is admissible to show consciousness of guilt.").

The government further established Mr. Moffitt was carrying a fanny pack on his person when arrested, which contained U.S. currency in excess of $16,000. Photographs of that money obtained from Mr. Moffitt's iPhone further linked Mr. Moffitt to the money. No evidence of Mr. Moffitt's employment as other than a drug trafficker was introduced. *See United States v. $2,500 in U.S. Currency*, 689 F.2d 10, 16 (2d Cir. 1982) (finding the government "met its burden of showing probable cause to believe that the seized money was furnished in exchange for drugs" because the $2,500 seized "is substantially greater than is commonly kept in residential premises by law-abiding wage earners" and because "[s]urveillance of [the defendant] over a period of time had revealed no other apparent explanation for the cash").

The black sling bag Mr. Moffitt carried at the time of his arrest contained distribution quantities of heroin, fentanyl, cocaine, and cocaine base. Ms. Mead, a forensic chemist for the State of Vermont, testified that some of the controlled substances recovered from the black sling bag were packaged in individual baggies for sale. Individual packaging of drugs is a strong indicator of an intent to distribute. *United States v. Hamilton*, 978 F.2d 783, 786 (2d Cir. 1992) (finding that jury determination of intent to distribute was supported, in part, because the defendant "was carrying 190 small bags of cocaine weighing nearly 60 grams, eight small bags of cocaine base and another bag containing three pieces of cocaine base[]"); *Turner v. United States*, 396 U.S. 398, 420 (1970) ("[T]he fact that [the defendant] possessed some 275 glassine bags of heroin without revenue stamps attached[,] . . . without more, solidly established that [the defendant's] heroin was packaged to supply individual demands and was in the process of being distributed[.]").

7

Although the powder cocaine was not individually packaged, Task Force Officer Jeffrey Stephenson testified that drug users do not typically keep a large amount of drugs for personal use but instead acquire those amounts in smaller increments for fear that they will lose self-control and use all of the drugs at once. *See United States v. Boissoneault*, 926 F.2d 230, 232 (2d Cir. 1991) (describing the "use of expert testimony by government agents to describe the characteristics and operating methods of narcotics dealers[]"); *United States v. Pugliese*, 712 F.2d 1574, 1582 (2d Cir. 1983) (upholding use of expert testimony to establish "the quantity and purity of heroin used by addicts").

The sling bag also contained a digital scale used for weighing drugs which had a white powder residue on it. *See United States v. Hammett*, 555 F. App'x 108, 110 (2d Cir. 2014) (finding it was not "irrational for the jury to find [the defendant] guilty of possession with intent to distribute" in part because the defendant was "found with a digital scale and two cell phones, which are tools that drug dealers often possess"). The three safes in Bernie Moffitt's apartment further support an inference that the controlled substances in Mr. Moffitt's possession were for distribution because such precautionary measures would be unnecessary if the possession of drugs was merely for personal use.

Viewing the evidence collectively rather than in isolation, and in the light most favorable to the prosecution, a reasonable jury could conclude beyond a reasonable doubt that the government proved each essential element of Count I. As a result, Mr. Moffitt's motion for a judgment of acquittal on Count I is DENIED.

### 2.      Count II: Possession of a Firearm in Furtherance of a Drug Trafficking Crime Alleged in Count I.

Mr. Moffitt argues that because "[t]here was no evidence to establish where the [firearms] came from or how they ended up in the sling bag" on the morning of Mr. Moffitt's arrest, and because "there was no direct evidence to establish that Mr. Moffitt even handled the [firearms]," (Doc. 137 at 7), a reasonable jury could not find he possessed them. He further claims that "there is insufficient evidence to establish that [he] possessed the guns for the purposes of a drug distribution crime." (*Id.* at 8).

8

For Count II, the government was required to prove beyond a reasonable doubt: (1) that Mr. Moffitt committed a drug trafficking crime for which he might be prosecuted in a court of the United States (Count I), and (2) that Mr. Moffitt knowingly possessed a firearm in furtherance of the drug trafficking crime charged in Count I.

To establish Mr. Moffitt's possession of the firearms, the government introduced evidence that a .22 revolver and a 9-millimeter pistol were located in the black sling bag recovered from the trash can and that the .22 revolver and the sling bag were both marked with the same green paint as Mr. Moffitt's clothing. Mr. Goble testified he witnessed Mr. Moffitt discarding the sling bag and identified Mr. Moffitt in the courtroom. This evidence was sufficient to allow a reasonable jury to find beyond a reasonable doubt that Mr. Moffitt was in physical possession of the two firearms.

Drug dealing is a "dangerous transactional business[,]" and drug dealers often possess firearms to defend their drugs, their drug proceeds, and themselves. *United States v. Moore*, 769 F.3d 264, 270 (4th Cir. 2014); *see also United States v. Hernandez*, 85 F. App'x 269, 271 (2d Cir. 2004) (noting "guns are frequently tools of the drug trade[]") (citing *United States v. Flaharty*, 295 F.3d 182, 200 (2d Cir. 2002)); *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976) ("Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment."). Nonetheless, "[t]he mere presence of a weapon at the scene of a drug crime, *without more*, is insufficient to prove that the [firearm] was possessed 'in furtherance of' the drug crime." *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (citations omitted) (emphasis in original). The prosecution must instead establish "a specific 'nexus' between the charged firearm and the charged drug selling operation." *Id.* (citing *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001)). Relevant factors include "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the [firearm] is loaded, proximity to drugs or

9

drug profits, and the time and circumstances under which the [firearm] is found." *United States v. Preston*, 499 F. App'x 70, 72 (2d Cir. 2012) (quoting *Snow*, 462 F.3d at 62 n.6).

At trial, the government established that each firearm was loaded, and the 9-millimeter pistol had the safety off. Because Mr. Moffitt was also carrying more than $16,000 in U.S. currency in a fanny pack, an accessible, loaded firearm provided ready protection for that sizable amount. The sling bag and fanny pack were both on Mr. Moffitt's person immediately prior to his arrest, and thus the guns and drugs were in close proximity. Text messages from Mr. Moffitt's iPhone established Mr. Moffitt sought to acquire firearms with some urgency, and Ms. Reynolds testified that Mr. Moffitt was en route to a drug transaction when he was arrested. A reasonable jury could find that Mr. Moffitt possessed the firearms to protect himself from being robbed of his drugs and drug proceeds as he prepared to engage in a drug transaction, and thus find his possession of firearms was in furtherance of a drug trafficking crime.

Viewing the evidence collectively in the light most favorable to the government, a reasonable jury could find that the government proved each essential element of Count II beyond a reasonable doubt. Mr. Moffitt's motion for a judgment of acquittal on Count II is therefore DENIED.

### 3.    Count III: Felon in Possession of a Firearm.

Mr. Moffitt rests on the arguments he made for Counts I and II to assert the government failed to establish Mr. Moffitt knowingly possessed the firearms in the bag. For Count III, the government was required to prove beyond a reasonable doubt: (1) that Mr. Moffitt was convicted of a crime punishable by imprisonment for a term exceeding one year; (2) that Mr. Moffitt knowingly possessed the firearm; (3) that at the time Mr. Moffitt possessed the firearm, Mr. Moffitt knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year; and (4) that the possession charged was in or affecting interstate commerce.

Prior to trial, Mr. Moffitt stipulated that:

[(1) a]s of June 1, 2022, [he] had previously been convicted of a crime punishable by a term of imprisonment exceeding one year[; and (2) that a]t

10

the time [he] was encountered by police on or about June 1, 2022, [he] knew that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year.

(Government Ex. 71.) He also stipulated that the two firearms "were manufactured outside the State of Vermont and had traveled in interstate commerce prior to June 1, 2022." (Government Ex. 70). Because the government established beyond a reasonable doubt that Mr. Moffitt knowingly possessed the firearms located in the black sling bag, it proved each essential element of Count III beyond a reasonable doubt, and Mr. Moffitt's motion for a judgment of acquittal on Count III is DENIED.

For all three Counts, Mr. Moffitt has not met his "heavy burden" to show that the evidence at trial was insufficient, *Matthews*, 20 F.3d at 548. Accordingly, his motion for a judgment of acquittal is DENIED.

### B.    Whether Mr. Moffitt Is Entitled to a New Trial.

Alternatively, Mr. Moffitt moves for a new trial. Fed. R. Crim. P. 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). The court must also "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurp[ing] the role of the jury." *Id.* at 133 (internal quotation marks omitted) (alteration in original). The court "generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility[.]" *Id.* "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414.

Ultimately, the court must determine "whether letting a guilty verdict stand would be a manifest injustice[.]" *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013), *cert.*

11

*denied*, 135 S. Ct. 400 (2014) (internal quotation marks omitted). While the court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," the court "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

A new trial is reserved for those instances in which there is "a real concern that an innocent person may have been convicted." *Aguiar*, 737 F.3d at 264 (internal quotation marks omitted). Here, the government introduced ample evidence to support the jury's verdict on all three Counts and to dispel any concern that the jury's verdict was the product of manifest injustice. This case thus lacks the "extraordinary circumstances" that would support the court usurping the jury's function. Because "'competent, satisfactory and sufficient evidence' in the record supports the jury verdict[,]" *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414), Mr. Moffitt's request for a new trial for insufficient evidence is DENIED.

Mr. Moffitt additionally argues that a new trial is warranted because the text and Facebook messages, other than the ones with Ms. Reynolds, were improperly admitted at trial due to lack of authentication. Mr. Moffitt contends that the government's evidence is insufficient to establish that he was the author of the messages, as Ms. Reynolds testified to occasionally using Mr. Moffitt's cell phone, including on the day of his arrest. He argues that the Facebook messages could have been generated from any computer or cellular device that is logged into Mr. Moffitt's Facebook account.

"Evidence may be admitted on a showing 'sufficient to support a finding that the item is what the proponent claims it is.'" *United States v. Encarnacion-Lafontaine*, 639 F. App'x 710, 713 (2d Cir. 2016) (citing Fed. R. Evid. 901). "The ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury." *Id.* (citing *United States v. Vayner*, 769 F.3d 125, 130 (2d Cir. 2014) (internal quotation marks omitted)). "The type and quantum of evidence" required for authentication "depends upon a context-specific determination whether the proof advanced is sufficient to support a finding that the item in question is what its proponent

12

claims it to be[,]" but the bar "is not particularly high." *Vayner*, 769 F.3d at 130 (citing *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (internal quotation marks omitted)). There is no single means of authentication. Courts have accepted different techniques in different contexts.[2] *Compare Encarnacion-Lafontaine*, 639 F. App'x at 713 (finding Facebook messages were authenticated because "the [g]overnment introduced evidence that (1) the Facebook accounts used to send the messages were accessed from IP addresses connected to computers near [the defendant's] apartment; (2) patterns of access to the accounts show[ed] that they were controlled by the same person; (3) . . . the accounts were used to send messages to other individuals connected to [the defendant] . . . [;] and (5) a limited number of people, including [the defendant], had information that was contained in the messages[]") *with Vayner,* 769 F.3d at 131-33 (finding social media evidence was not authenticated because the government only provided evidence that the account was opened in the defendant's name and that the account had his photograph and basic biographical information known to others).

Through Ms. Reynolds's testimony, the government established Mr. Moffitt's ownership of a Facebook account under the name "Smm D Moff" and his authorship of messages coming from that account. The iPhone recovered by VSP was logged into both Mr. Moffitt's and Ms. Reynolds's Facebook accounts. Multiple messages on the phone addressed the user by Mr. Moffitt's name and nicknames, including messages from Mr. Moffitt's father. This evidence was sufficient to permit a reasonable jury to find that Mr. Moffitt was both the owner of the phone and the author of several of the messages presented at trial. It was the jury's task to determine whether the messages were sufficiently authenticated. *See Ricketts v. City of Hartford*, 74 F.3d 1397, 1411 (2d Cir.

---

[2] Comments to the Federal Rules of Evidence provide, for example, that "[a]n e-mail was authenticated when (1) it bore the purported author's e-mail address, (2) the contents reflected detailed knowledge of the purported author's conduct, (3) the author identified himself using the purported author's nickname, and (4) in a telephone conversation shortly after the e-mail, the purported author made the same requests as in the e-mail." Fed. R. Evid. 901 advisory committee's note (citing *United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000), *cert. denied*, 533 U.S. 940 (2001)).

13

1996) ("The judge's preliminary determination does not, however, finally establish the authenticity of the tape. As with other matters under Rule 104(b), only the jury can finally decide that issue.") (quoting *United States v. Sliker*, 751 F.2d 477, 498-500 (2d Cir. 1984)).

In any event, the messages challenged by Mr. Moffitt were only one of many pieces of evidence presented at trial. A reasonable jury could have found Mr. Moffitt guilty beyond a reasonable doubt without relying on the text and Facebook messages. The admission of the challenged communications therefore does not rise to a "manifest injustice" requiring this court to grant a new trial. Mr. Moffitt's motion for a new trial for lack of authentication is DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES Mr. Moffitt's motion for a judgment of acquittal or for a new trial. (Doc. 137.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 23rd day of September, 2024.

Christina Reiss, Chief Judge
United States District Court